Slip Op. 21-97

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **HEZE HUAYI CHEMICAL CO., LTD. AND JUANCHENG KANGTAI CHEMICAL CO., LTD.**, | |
| Plaintiffs, | |
| v. | **Before: Timothy M. Reif, Judge** |
| **UNITED STATES**, | **Court No. 20-00058** |
| Defendant, | |
| **BIO-LAB, INC., CLEARON CORP. AND OCCIDENTAL CHEMICAL CORPORATION**, | |
| Defendant-Intervenors. | |

### <ins>OPINION</ins>

[Final Determination sustained.]

Dated: August 5, 2021

<ins>Gregory S. Menegaz</ins>, deKieffer & Horgan PLLC, of Washington, DC, argued for plaintiffs Heze Huayi Chemical Co. and Juancheng Kangtai Chemical Co.  With him on the brief were <ins>Alexandra H. Salzman</ins> and <ins>James K. Horgan</ins>.

<ins>Sonia M. Orfield</ins>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for the defendant United States.  Of counsel on the brief was <ins>Jesus N. Saenz</ins>, Attorney, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<ins>James R. Cannon, Jr.</ins>, Cassidy Levy Kent (USA) LLP, of Washington, DC, argued for defendant-intervenors Bio-Lab, Inc., Clearon Corporation and Occidental Chemical Corporation. With him on the brief were <ins>Jonathan M. Zielinski</ins> and <ins>Ulrika Kristin Skitarelic Swanson</ins>.

Reif, Judge: This action arises from a challenge by plaintiffs, Heze Huayi

Chemical Co., Ltd. ("Heze Huayi") and Juancheng Kangtai Chemical Co., Ltd.

("Kangtai," and, collectively, "plaintiffs") to certain aspects of the final results of an

administrative review of the antidumping duty order covering chlorinated isocyanurates

("chlorinated isos") published by the Department of Commerce ("Commerce") in the

Federal Register on June 20, 2016.[1]  *See Chlorinated Isocyanurates from the People's*

*Republic of China*, 85 Fed. Reg. 10,411 (Dep't Commerce Feb. 24, 2020) (final results)

("Final Determination"), and accompanying Issues and Decision Memorandum ("IDM").

As a result, plaintiffs were assigned an assessment deposit rate of 116.83 percent for

Heze Huayi and 76.63 percent for Kangtai.  *See* Final Determination.

Plaintiffs filed a motion for judgment upon the agency record pursuant to Rule

56.2 and challenge as unsupported by substantial evidence three principal aspects of

Commerce's Final Determination: (1) to select Mexico over Malaysia as a surrogate

country; (2) to determine that Mexico sources the highest quality information; and, (3) to

adjust the Mexican "freight-on-board" ("FOB") values to a "cost of insurance and freight"

("CIF") basis.  *See* Pls.' Rule 56.2 Mem. Supp. Mot. for J. Upon the Agency R., ECF No.

30 ("Pls. Br."); *see also* Pls.' Reply Br., ECF No. 33 ("Pls. Reply Br.").  Defendant United

States ("Government") and defendant-intervenors, Bio-Lab, Inc., Clearon Corp. and

Occidental Chemical Corporation (collectively "defendant-intervenors") respond that

---

[1] Chlorinated isos may be processed in various forms, commonly including, for example, swimming pool additives.  Compl. 2, ECF No. 7 ("Complaint").

Commerce's determination is supported by substantial evidence and is otherwise in accordance with law.  *See* Def.'s Resp. to Pls. Mot. for J. Upon the Agency R., ECF No. 31 ("Def. Br."); *see also* Response Brief of Bio-Lab, Inc., Clearon Corp., and Occidental Chemical Corporation, ECF No. 32 ("Def.-Intervenors' Br.").

For the reasons discussed below, the court sustains Commerce's Final Determination.

## BACKGROUND

On August 10, 2018, Commerce initiated the thirteenth administrative review of the antidumping duty order covering chlorinated isos from the People's Republic of China ("China").  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 83 Fed. Reg. 39,688 (Dep't Commerce Aug. 10, 2018) (initiation of antidumping and countervailing duty administrative review).  The review covered two producers and exporters, Heze Huayi and Kangtai, during the period from June 1, 2017, to May 31, 2018.  *Id*.; *see also Chlorinated Isocyanurates from the People's Republic of China*, 84 Fed. Reg. 42,891 (Dep't Commerce Aug. 19, 2019) (preliminary results) ("Preliminary Determination") and accompanying preliminary decision memorandum ("PDM").

Because China is a non-market economy country, the Tariff Act of 1930 ("Tariff Act") requires Commerce to calculate the normal value of chlorinated isos based on

surrogate values offered in a comparable market economy.  *See* Tariff Act of 1930, §

773, 19 U.S.C. § 1677b(c)(1) (2015).[2]

On October 3, 2018, Commerce placed on the record a list of potential surrogate

countries that were comparable in terms of economic development to China and

solicited comments from interested parties.  *See* PDM at 6-7, 10.  This list included

Romania, Malaysia, Russia, Brazil, Mexico and Kazakhstan.  Pls. Br. at 10; Def. Br. at

3; *id.*  Commerce considered production of comparable merchandise (calcium

hypochlorite and sodium hypochlorite) and identical merchandise (chlorinated isos) in its

primary surrogate country inquiry.  PDM at 6-8.  Commerce found that each country

listed preliminarily exported either comparable merchandise, identical merchandise or

both.  PDM at 6-7.

On December 4, 2018, Commerce received comments from respondents (now

plaintiffs) and petitioners (now defendant-intervenors) on the list of potential surrogate

countries.  *See* Plaintiffs' Letter on Comments of Surrogate Country Selection, PD 35

(Dec. 4, 2018); *see also* Letter from Petitioners on Comments on Primary Surrogate

Country Selection, PD 32-34 (Dec. 4, 2018) ("Petitioners' Letter").  Plaintiffs argued that

Brazil, Malaysia and Romania were suitable as surrogate countries, and defendant-

intervenors argued that Mexico had the highest quality surrogate values.  Petitioners'

Letter, PD 32-34; PDM at 6, 10-14; IDM at cmt. 1.  Plaintiffs and defendant-intervenors

submitted surrogate value information on February 19, 2019, and rebuttal surrogate

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of
Title 19 of the U.S. Code, 2015 edition.

value information on February 26, 2019.  *See* Plaintiffs' Letter on Surrogate Values for

the Preliminary Results, PD 44-49 (Feb. 19, 2019); *see also* Petitioners' Letter on Initial

Surrogate Value Data, CD 30, PD 51-54 (Feb. 19, 2019); *see also* PDM at 8.  Plaintiffs

submitted their final surrogate value information on July 10, 2019.  *See* Plaintiffs' Letter

on Final Surrogate Value ("SV") Submission (Jul. 10, 2019).

I.      **Preliminary Determination**

        On August 19, 2019, Commerce preliminarily determined that each country on

the surrogate country list was a significant producer of merchandise comparable to the

subject merchandise — calcium hypochlorite and sodium hypochlorite.  PDM at 11-14.

However, Commerce found that only Mexico was a significant producer of *identical*

merchandise — chlorinated isos.  *Id*.

        In reaching this decision, Commerce relied on information demonstrating that a

Mexican company named Aqua-Clor S.A. de C.V. ("Aqua-Clor") produced chlorinated

isos and exported a confirmed amount of over 1.6 million kilograms of chlorinated isos

during the relevant period of review ("POR").  PDM at 12; IDM at 11; Pls. Br. at 8.

Commerce also examined the financial statements of four Malaysian companies — Mey

Chern Chemicals SDM ("Mey Chern"), Whiting Sdn. Bhd. ("Whiting"), Accot

Technologies Sdn. Bhd. ("Accot") and CCM Chemicals Sdn. Bhd. ("CCM") — and

website information for two additional Malaysian producers — Leesonic and Setia Maju.

PDM at 12-13.  Of these companies, Commerce determined preliminarily that there was

sufficient information on the record showing CCM to be a producer of comparable

merchandise and Setia Maju to be a producer of identical merchandise but that there

was no information on the record that either company was a "significant producer."  *Id*.

Commerce noted its "preference to select a surrogate country that produces identical

merchandise over one that only produces comparable merchandise" and that the

selection of Mexico as the surrogate country was consistent with three prior

administrative reviews.  *Id*. at 13-14.

Commerce noted that there were "a number of factors of production ("FOPs") for

which we require [surrogate value] data, with chlorine and caustic soda considered

among the most significant inputs used in the production of chlorinated isos.

Commerce also requires usable financial statements from a producer of identical or

comparable merchandise surrogate country."  *Id*. at 14.  As there were no surrogate

value data or any surrogate financial statements on the record for Brazil, Kazakhstan

and Russia, Commerce was "left with Malaysia, Mexico, and Romania as options for

potential primary surrogate country."  *Id*.

Commerce weighed the quality of the Mexican data against the Malaysian and

Romanian data and found that Mexico had "better [surrogate value] data because it

ha[d] usable [surrogate values] for all inputs."  *Id*. at 16.  Commerce specified that "we

preliminarily find the Malaysian [surrogate values] for raw materials, packing, and

energy other than electricity, unusable because they are sourced from Trade Data

Monitor ("TDM"), a subscription-based database."  *Id.* at 16.  Commerce found that the

Romanian data were inadequate for calculating surrogate financial ratios because of a

lack of usable financial statements by producers in Romania.  Commerce found that the

Mexican data were stronger because the financial statements of CYDSA, a Mexican

conglomerate with a large chemicals division, were "contemporaneous and indicative of a producer that sells comparable merchandise."  IDM at 7-8.  PDM at 16.

## II.    Final Determination

On February 24, 2020, Commerce published its Final Determination and continued to select Mexico as the primary surrogate country, which yielded a 32.23 percent margin for Heze Huayi and a 58.07 percent margin for Kangtai.  IDM at 7-15; Pls. Br. at 2, 4, 29.  Commerce's selection of CYDSA's financial statement to calculate the financial ratios and of the data sourced from Global Trade Atlas ("GTA") remained unchanged from the Preliminary Determination.  IDM at 2, 15-17.

Commerce made only one change to the Preliminary Determination in deciding to adjust the Mexican FOB import values to a CIF basis to include international freight costs.  *Id*.  Commerce explained that, pursuant to a recent administrative review, "respondents are correct that Commerce's practice is to adjust the import value in situations where the primary surrogate country's import statistics do not include international freight costs."  *Id.* at 16 (citing *Hydrofluorocarbon Blends from the People's Republic of China*, 84 Fed. Reg. 17,380 (Dep't Commerce Apr. 25, 2019) (final results) and accompanying Issues and Decision Memorandum at Comment 4).  Commerce explained that it rejected the argument that an adjustment would produce an unacceptable distortion into the margin calculations because "the addition of international freight and marine insurance to FOB values results in no double counting, and that limiting the selection of surrogate countries to countries that report import data on a CIF basis could have the effect of unreasonably limiting the potential pool of

surrogate value source countries."  *Id.*  Commerce also noted that respondents could

have provided alternative information pertaining to the FOB/CIF adjustment "but did not

do so, despite the fact that they are the party that has raised the concern with the FOB

terms of the Mexican data."  *Id*. at 17.

<h3 style="text-align:center">STANDARD OF REVIEW</h3>

The court will uphold Commerce's determination if it is supported by "substantial

evidence on the record" and is otherwise "in accordance with law."  19 U.S.C. §

1516a(b)(1)(B)(i).  Substantial evidence is "more than a mere scintilla" of evidence to

support the underlying conclusions.  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229

(1938).  Substantial evidence must be measured by a review of the record in its entirety,

"including whatever fairly detracts from the substantiality of the evidence."  *Atlantic

Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

The court may draw two inconsistent conclusions from the record; however, this

"does not prevent an administrative agency's finding from being supported by

substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)

(citation omitted).  Where, as here, Congress has entrusted an agency to administer a

statute requiring fact-intensive inquiries, the agency's conclusion should be reversed

only if the record is "so compelling that no reasonable factfinder" could reach the same

conclusion.  *INS v. Elias-Zacarias*, 502 U.S. 478, 483-484 (1992); *accord Nucor Corp. v.

United States*, 33 CIT 207, 232, 612 F. Supp. 2d 1264, 1287 (2009).

Ultimately, under the substantial evidence standard, "the Court will not disturb an

agency determination if its factual findings are reasonable and supported by the record

as a whole, even if there is some evidence that detracts from the agency's conclusion." *Shandong Huarong Gen. Corp. v. United States*, 25 CIT 834, 159 F. Supp. 2d 714, 718 (2001), *aff'd sub nom. Shandong Huarong Gen. Grp. Corp. v. United States*, 60 F. App'x 797 (Fed. Cir. 2003). Where "there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404-05, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987).

## LEGAL FRAMEWORK

In proceedings involving a non-market economy (NME), such as China, Commerce determines the normal value of the subject merchandise by evaluating the "best available information" from a market economy country — or market economy countries — to derive surrogate valuations for factors of production including raw materials, labor and utilities. 19 U.S.C. § 1677b(c). The statute requires that Commerce "shall utilize, to the extent possible," surrogate factors of production from one or more market economy countries that are: (1) "at a level of economic development comparable to that of the nonmarket economy country;" and, (2) "*significant* producers of *comparable* merchandise." *Id*. § 1677b(c)(4)(A)-(B) (emphasis supplied). If more than one market economy country meets both requirements, Commerce's policy is to evaluate and compare the reliability and completeness of the record data from those countries. Import Admin., U.S. Dep't of Commerce, *Non-Market Economy Surrogate Country Selection Process*, Policy Bulletin 04.1 (2004)

http://enforcement.trade.gov/policy/bull04-1.html (last visited June 9, 2021) ("Policy

Bulletin 04.1").[3]

       The statute specifies that Commerce must use "best available information" when

valuing factors of production.  19 U.S.C. § 1677b(c)(1)(B).  The statute does not define

"best available information," which means that Commerce has "broad discretion" to

decide which information in the record meets this standard.  *Zhejiang DunAn Hetian*

*Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (citations omitted).  In

practice, Commerce seeks to fulfill its statutory duty by selecting, "to the extent

practicable, surrogate values that are product-specific, representative of a broad-market

average, publicly available, contemporaneous with the period of review, and tax and

duty exclusive."  *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1293 (Fed.

Cir. 2016); *see also* Policy Bulletin 04.1.

       In cases involving NME countries, although "the standard of review precludes the

court from determining whether the Department's choice of surrogate value was the

---

[3] Policy Bulletin 04.1 outlines a four-step approach to surrogate country selection:

> (1) the Office of Policy ("OP") assembles a list of potential surrogate countries
> that are at a comparable level of economic development to the [non-market
> economy] country; (2) Commerce identifies countries from the list with producers
> of comparable merchandise; (3) Commerce determines whether any of the
> countries which produce comparable merchandise are significant producers of
> that comparable merchandise; and (4) if more than one country satisfies steps
> (1)–(3), Commerce will select the country with the best factors data.

*Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir. 2016)
(citation omitted); *see also* Policy Bulletin 04.1.

best available on an absolute scale, the court may determine the reasonableness of

Commerce's selection of surrogate prices."  *Citic Trading Co. v. United States*, 27 CIT

356, 366 (2003).  As mentioned above, Commerce has broad discretion to determine

what record material constitutes best available information.  However, "[t]his discretion .

. . is constrained by the underlying objective of the statute; to obtain the most accurate

dumping margins possible."  *Id*. at 365 n.12 (citations omitted).

    This Court has spoken on the meaning of "best available information" in the

context of 19 U.S.C. § 1677b(c).  In *Dorbest*, this court provided that:

> The term "best available" is one of comparison, i.e., the statute
> requires Commerce to select, from the information before it
> the best data for calculating an accurate dumping margin.
> The term "best" means "excelling all others."  Oxford English
> Dictionary 139 (2d 1989); Webster's II new Riverside
> University Dictionary 168 (1988) ("[e]xceeding all others in
> excellence, achievement, or quality").  This "best" choice is
> ascertained by examining and comparing the advantages and
> disadvantages of using certain data as opposed to other data.

*Dorbest Ltd. et al. v. United States*, 30 CIT 1671, 1675, 462 F. Supp. 2d 1262, 1268

(2006) (citation omitted).  The *Dorbest* court also clarified that "[o]n *factual issues*, the

court's role 'is not to evaluate whether the information Commerce used was the best

available, but rather whether a reasonable mind could conclude that Commerce chose

the best available information.'"  *Id*. at 1676 (citing *Goldlink Indus. Co. v. United States*,

30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006)) (citations omitted).

    The parties differ as to the standard that applies to this Court's review of

Commerce's selection of data, and, in particular, the level of specificity required by

Commerce in demonstrating that its choice was made using the best available

information.  Defendant argues that Commerce is not obligated to provide an "explicit

explanation . . . where the agency's decisional path is reasonably discernible."

*Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998) (citation

omitted).  Plaintiffs cite *Dorbest*, which states: "For the court to conclude that a

reasonable mind would support Commerce's selection of the best available information,

Commerce needs to justify its selection of data with a reasoned explanation."  *Dorbest*,

462 F. Supp. 2d at 1269; *see also Olympia Indus., Inc. v. United States*, 22 CIT 387,

390, 7 F. Supp. 2d 997, 1001 (1998) ("Commerce has an obligation to review all data

and then determine what constitutes the best information available or, alternatively, to

explain why a particular data set is not methodologically reliable.").  Plaintiffs argue also

that "best available information" in the present case means "quality available surrogate

values that are most similar to the subject merchandise production in China."  Pls. Reply

Br. at 2.

**DISCUSSION**

**I.    Commerce's Selection of Mexico as Primary Surrogate Country**

As outlined above, 19. U.S.C. § 1677b(c)(4) (section 1677b(c)(4)) requires that,

in valuing factors of production, Commerce must select surrogate countries that are

"significant producers of comparable merchandise."  In making this determination,

Commerce must use the "best available information."  19 U.S.C. § 1677b(c)(1)(B).  The

court will address first whether Commerce's findings were based on a permissible

construction of the terms "significant producers" and "comparable merchandise" before

turning to whether Commerce met its obligation to use "best available information" as required by statute.

### A.   Whether Commerce's Finding that Mexico Was a "significant producer[ ] of comparable merchandise" Was Reasonable and Based on a Permissible Construction of the Statute

The court begins by considering whether Commerce's finding that Mexico is a significant producer within the meaning of section 1677b(c)(4) was reasonable. Because the term "significant producers" is left undefined and ambiguous, the court must determine whether Commerce's interpretation "'is based on a permissible construction of the statute.'" *Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337, 1344 (Fed. Cir. 2017) (quoting *Chevron, U.S.A., Inc. v. Nat'l Res. Defense Council, Inc.*, 467 U.S. 837, 843 (1984)).

Plaintiffs define significant producer as a country "whose domestic production could influence or affect world trade." Plaintiffs argue that this definition is suggested by the court in *Fresh Garlic Producers Ass'n v. United States*, 39 CIT ___,___, 121 F. Supp. 3d 1313, 1338 (2015) ("*FGPA*"); *see also* Pls. Br. at 9. Continuing to rely on *FGPA*, plaintiffs maintain that the plain meaning of "significant" is "having or likely to have influence or effect" and add that it is inherently a comparative term. *FGPA*, 121 F. Supp. 3d at 1338; *see also* Pls. Br. at 9. Plaintiffs submit that Commerce did not conduct a comparison before determining that Mexico was a "significant producer" because Mexico was found to be the only country with production of identical merchandise. Pls. Br. at 9. This omission, plaintiffs conclude, means that the record indicated only *some*, rather than *significant*, production of chlorinated isos. *Id*.

The Government rejects plaintiffs' definition of "significant producer" as overly narrow and adds that this Court declined to apply this definition in plaintiff Kangtai's challenge to "significant production" in a similar, prior action.  *Juancheng Kangtai Chem. Co. v. United States*, 41 CIT ___, Slip Op. 17-3, 2017 WL 218910 (CIT Jan. 19, 2017) ("*Kangtai*").  In the determination subject to review in *Kangtai*, Commerce interpreted "significant" to mean "a noticeably or measurably large amount," and the court confirmed that this interpretation was entitled to *Chevron* deference.  *Id*. at *4.

The Government contends further that the court in *FGPA* acknowledged that plaintiffs' definition of "significant producer" was "*an* interpretation," implying that other interpretations of the statute may be permissible.  *FGPA*, 121 F. Supp. 3d at 1338 (emphasis supplied).  The *FGPA* court added that "Commerce is free to depart from its prior practice in evaluating whether a country is a significant producer, so long as that evaluation rests on a reasonable interpretation of the statutory language."  *Id*. at 1339.

The Government is correct in noting that the definition of "significant producer" applied by the court in *FGPA* is not apt here.  This court in *Heze Huayi Chem. Co. v. United States* confirmed "that the ability to influence world trade is not a standard required by the statute, 'it is only one of many criteria the Department may use to determine whether a country is a significant producer.'"  Slip Op. 18-57, 2018 WL 2328183 at *4 (CIT May 22, 2018) (citing *Chlorinated Isocyanurates From the People's Republic of China*, 82 Fed. Reg. 4852 (Dep't Commerce Jan. 17, 2017) (final results of antidumping duty admin. review; 2014-2015) and accompanying Issues and Decision Memorandum at 5).  Rather than adopting a single definition of "significant producers,"

this court has recognized instead that "Commerce identifies a significant producer based on a totality of the circumstances, and makes its decision concerning significance on a case-by-case basis." *Dorbest*, 30 462 F. Supp. 2d at 1274.

As noted, the court in *FGPA* did not endorse a single interpretation of "significant producer."  However, the court did speak to which interpretations of the statute are *impermissible*.  For example, the court held that Commerce determined improperly that a country was a significant producer simply because it had "any commercially meaningful production" when, at the same time, the record indicated that Commerce's selection had only "miniscule" levels of production as described by the court.  *FGPA*, 121 F. Supp. 3d at 1339.  The court concluded further that when there are more than a "handful" of countries competing in the global market for a good, "significant production" may not simply mean "non-zero production."  *Id*. (internal citation omitted).

Plaintiffs here have failed to show that Mexico's production of comparable merchandise was either "miniscule" or only marginally more than "non-zero production." *Id*.  Plaintiffs have similarly not provided any record material demonstrating that Mexico's production of chlorinated isos was so minimal that it failed to affect world trade — even if influence on world trade were a statutorily required component of significance.  *Kangtai*, 2017 WL 218910 at *4 ("Even assuming that significance required an influence on world trade . . . Kangtai has not identified any record evidence that the Philippines' production of the comparable merchandise, sodium hypochlorite, was so low that it completely failed to affect world trade.").

Plaintiffs, however, are correct in arguing that the phrase "significant producer" involves an aspect of comparison.  *See Jacobi Carbons AB v. United States*, 42 CIT ___,___, 313 F. Supp. 3d 1344, 1358 (2018) ("Commerce's Policy Bulletin 04.1 recognizes the comparative aspect of the phrase 'significant production.'").  However, the court does not agree with plaintiffs' contention that Commerce overlooked this comparative aspect in its reasoning for selecting Mexico as a primary surrogate country. Here, Commerce specifically compared Mexico to Malaysia.  In fact, plaintiffs argue that Commerce "continued its analysis of the comparative Mexico and Malaysia surrogate value records before selecting the primary surrogate country because Malaysia has some production of identical merchandise."  *See* PDM at 7.  Commerce made this comparison, although it claimed that it was "not required to consider parties' arguments for comparable merchandise."  IDM at 11.

Plaintiffs' approach to the comparative element inherent in the phrase "significant producer" would require the court to find that the comparison in this case must be between production of *identical* merchandise in Mexico and production of *comparable* merchandise in Malaysia.  The court declines to do so and determines instead that a comparison between identical production in Mexico and identical production in Malaysia was reasonable in the instant case.  Accordingly, the court concludes that Commerce properly determined that Mexico was a "significant producer" based on a reasonable interpretation of 19 U.S.C. § 1677b(c)(4).

     **B.**     **Commerce's Reliance on Record Information Showing Production of Identical Merchandise in Mexico in Interpreting "Comparable Merchandise" under the Statute**

The court turns next to the requirement in section 1677b(c)(4) that Commerce select a surrogate country that is a "significant producer[] of *comparable* merchandise" in valuing factors of production.  (Emphasis supplied).  At issue here is Commerce's decision to value factors of production using data from primary surrogate countries with production of *identical merchandise* when that method presents no data difficulties.[4]

Plaintiffs contend that the statute does not specify whether identical merchandise is superior to comparable merchandise and argue that a robust market of comparable merchandise in this case is "equally probative" in the surrogate value determination.  Pls. Br. at 10-11.  Plaintiffs do not dispute that identical merchandise meets the definition of comparable merchandise.  Pls. Rep. Br. at 2.  Plaintiffs argue instead that Commerce should have considered the quality of the information and the specific facts of the case before deciding if record data on comparable or identical production better represented "best available information."  *Id.*  Accordingly, plaintiffs argue that Commerce should have given greater weight to data on the production of comparable merchandise in Malaysia.  Pls. Br. at 11.

Plaintiffs argue also that examining export data on production of comparable merchandise (as opposed to restricting consideration to data on identical merchandise

---

[4] While "data difficulties" is not defined in section 1677b, this court has recognized that it is necessary "for Commerce to feel assured that the data it is employing is sufficient and reliable."  *Dorbest Ltd. et al. v. United States*, 30 CIT 1671, 1682, 462 F. Supp. 2d 1262, 1273 (2006).

alone) avoids the unnecessary narrowing of countries that can be used as primary

surrogate countries.  Pls. Br. at 10.  Plaintiffs add that the approach of examining data

on production of comparable merchandise has the benefit of broadening the number of

countries that Commerce may compare, in turn allowing for a better estimation of which

countries serve as significant producers.  *Id*.  Plaintiffs conclude that Commerce failed

to use "best available information" because Commerce based its primary surrogate

country selection on production of identical merchandise.  *Id*.

The Government argues that because the statute does not define "comparable,"

Commerce has discretion to determine its own methodology for assessing

comparability, so long as Commerce's interpretation is reasonable.  Def. Br. at 13; *see*

*also Heze Huayi*, 2018 WL 2328183 at *4 ("[t]he statute does not speak directly to the

meaning of 'comparable'; therefore, Commerce's interpretation will govern if it is

reasonable.") (citation omitted).  To this end, Commerce has established a methodology

for selecting primary surrogate countries.  The Government emphasizes that Policy

Bulletin 04.1, which describes Commerce's non-market economy surrogate country

selection process, specifies that "where identical merchandise is not produced, the team

must determine if other merchandise that is comparable is produced."  Policy Bulletin

04.1 at 2, cited in Def. Br. at 14.  The Policy Bulletin clarifies further that "[i]f considering

a producer of identical merchandise leads to data difficulties, the operations team may

consider countries that produce a broader category of reasonably comparable

merchandise."  Policy Bulletin 04.1 at n. 6.

The Government argues that this approach implies that when identical merchandise is produced, Commerce's practice does not require consideration merely of comparable merchandise.  Def. Br. at 14.  The Government also notes that this Court has upheld the methodology for selecting primary surrogate countries as outlined in Policy Bulletin 04.1.  *Id.*  The Government cites *Heze Huayi*, 2018 WL 2328183, which involved the same antidumping duty order and the same selected surrogate country at issue here.  Def. Br. at 13.  There, the court held specifically that "production of identical merchandise is production of 'comparable' merchandise."  *Heze Huayi*, 2018 WL 2328183 at *4.

In addition to finding that identical merchandise meets the statutory requirement of "comparable merchandise," this Court has also found that the analysis outlined in Policy Bulletin 04.1 n.6 "is in accordance with the legislative history of the governing statute."  *Dorbest*, 462 F. Supp. 2d at 1682.  This part of the Policy Bulletin dictates: "If considering a producer of identical merchandise leads to data difficulties, [Commerce] may consider countries that produce a broader category of reasonably comparable merchandise."  Policy Bulletin 04.1 n.6.

In this case, the Government explains that Commerce prefers to select surrogate values based on data showing production of identical merchandise.   Def. Br. at 14.  This practice allows Commerce to avoid adjustments that may introduce error or inaccuracy.   Avoiding adjustments is a factor that Commerce considers when determining what constitutes "best available information."  *Id.*; *see Mid Continent Nail*

*Corp. v. United States*, 34 CIT 512, 712 F. Supp. 2d 1370 at n.7 (2010) ("adjustments

provide an opportunity for the introduction of inaccuracies into the process").

The court holds that Commerce's interpretation in this case of "comparable

merchandise" is reasonable, especially in light of the *Dorbest* court's finding that

identical merchandise is a reasonable interpretation of "comparable merchandise" as

outlined in Policy Bulletin 04.1, and given Commerce's reasoning in this case supporting

its preference for data on identical production.

### C.    Commerce's Finding that Mexican Data Constituted "Best Available Information" on Significant Production of "Comparable Merchandise"

Plaintiffs do not dispute that Mexico produces identical merchandise, nor do they

dispute that Mexico produces comparable merchandise.  Pls. Br. at 11.  Instead,

plaintiffs argue first that Malaysia is a significant producer of both identical and

comparable merchandise and that Malaysian surrogate values are "by far the best

available information" for purposes of surrogate data comparison in this case.  *Id.*  Next,

plaintiffs argue that there were flaws in the data substantiating production of identical

merchandise in Mexico.  *Id*. at 12.  The court addresses each of these arguments below

in turn.

#### 1.    Malaysian Data

Plaintiffs argue that Commerce failed to consider properly record material

detailing the size and prevalence of the Malaysian market for identical merchandise.

Pls. Br. at 8.  Specifically, plaintiffs contend that Commerce did not weigh adequately

material confirming first that Malaysia produces chlorinated isos, and, second, that

Malaysia and Mexico have the same market size of a variant of chlorinated isos.  *Id*.
This record material included the financial statements and information from the selected
webpages of four Malaysian producers and/or suppliers of chlorinated isos.  PDM at 12;
*see also* Pls. Br. at 13-15.  At the same time, plaintiffs concede that none of this record
material specified the actual level of production in Malaysia.  Pls. Br. at 8.

Plaintiffs argue also that the record contains information demonstrating that
Malaysia is a significant producer of sodium hypochlorite and calcium hypochlorite, both
of which are considered by plaintiffs to be "highly comparable."[5]  Plaintiffs point to the
record, which contains export data on production of comparable merchandise in
Malaysia, indicating that Malaysia is the second-most significant exporter of comparable
merchandise among listed surrogate countries.  Pl. Rep. Br. at 4.

By contrast, the Government and defendant-intervenors argue that Commerce
examined adequately data on Malaysian production of identical merchandise and that
Commerce provided detailed reasoning as to why it found this information insufficient.
Def. Br. at 17; Def.-Intervenors Br. at 8-9.  Specifically, Commerce found that plaintiffs
did not provide any corroborating information on production data that could substantiate
the claim that either Malaysian companies or Malaysia as a whole served as a
significant producer of identical merchandise during the POR.  IDM at 11.

---

[5] During Oral Argument, plaintiffs explained that they "use[d] the term highly
comparable, just to make the point that we're not talking about a giant baske[t] of
categories of very different chemicals with very different raw materials."  Oral Argument
Tr. at 49.  The Government describes sodium hypochlorite and calcium hypochlorite as
"comparable product[s]".  Def. Br. at 21.

As to record material showing Malaysian production of comparable goods, the Government does not dispute that Malaysia was shown to be a significant producer of comparable goods.  Def. Br. at 19.  In fact, Commerce found that all countries listed initially as surrogate country options were significant producers of comparable goods.  PDM at 14.  However, the Government argues that the record was stronger for Mexico than Malaysia because Mexico was a significant producer of *both* identical and comparable merchandise.  Def. Br. at 16; *see also* IDM at 11-12.

In this case, plaintiffs demonstrated the existence of some production of identical merchandise, though they failed to substantiate this claim with any record material specifying the level of chlorinated isos production in Malaysia.  Def. Br. at 16.  At the same time, the record also indicates that Commerce considered adequately Malaysian data on both comparable and identical production.  PDM at 12.  In fact, Commerce provided detailed reasons that it found the Malaysian data to be flawed.  *Id*.

 Commerce stated that the first reason for its finding is that only one of the four financial statements for a Malaysian company called Setia Maju indicated some production of chlorinated isos in Malaysia.  PDM at 12.  Notably, plaintiffs did not provide any additional corroborating information showing production data that could substantiate the claim that either Setia Maju or Malaysia as a whole were significant producers of identical merchandise during the POR.  IDM at 11.  Second, Commerce explained that plaintiffs' submission of a subscription-based market research report on the world pool chemical industry did not provide any specific information on Malaysian producers.  IDM at 14.  Third, Commerce noted that Malaysia did not have a separate

Harmonized Tariff Schedule (HTS) classification for chlorinated isos, making it difficult to measure exports and, therefore, production in the country.  PDM at 12.  Commerce found the four Malaysian financial statements used by plaintiffs as support to be either unusable or less reliable than the Mexican financial statements.  *Id*.

In sum, Commerce not only considered record information showing production of comparable and identical merchandise in Malaysia, but also provided detailed explanations of the deficiencies that Commerce found in this information.  Accordingly, Commerce considered appropriately Malaysian data on both comparable and identical merchandise, and this consideration indicates that Commerce's selection of Mexico rather than Malaysia as primary surrogate country was reasonable.

### 2.  Mexican Data

Plaintiffs next argue that Commerce encountered factor valuation difficulties such that the use of Mexico as a primary surrogate country was not reasonable.  Pls. Br. at 7-12.  Commerce considered arguments related to factor valuation issues in Mexico and found that "the selection of the Mexican data has not led to factor valuation difficulties." IDM at 18.  Moreover, Commerce found that Mexico was the only potential surrogate country that produced *quantifiable* amounts of identical merchandise.  Def. Br. at 12; PDM at 14; IDM at 11, 18.

Commerce found that the information submitted by petitioners was sufficient to support the conclusion that Mexico was a significant producer of chlorinated isos during the POR.  IDM at 11.  For example, the record contained: an affidavit and attached joint venture agreement demonstrating Mexican production of chlorinated isos by Aqua-Clor;

product registrations filed with the U.S. Environmental Protection Agency for specific brand names of subject merchandise; and, information that corroborated the extensive Port Import/Export Reporting Service ("PIERS") cross-border trade data for shipments of subject merchandise with export data of identical merchandise from the Global Trade Atlas ("GTA").  *Id.*

These three types of information were more reliable than the information on the record pertaining to Malaysian producers, Commerce reasoned, because Mexico had export statistics that included a precise HTS classification for chlorinated isos, which allowed Commerce to quantify levels of production in Mexico.  Def. Br. at 17.  The Government adds that in three prior administrative reviews of the same antidumping order on chlorinated isos from China, Commerce similarly selected Mexico as a primary surrogate country because it was the sole "economically comparable country that was also a significant producer of both comparable and identical merchandise."  Def. Br. at 4.

The Government argues further that the court in *Heze Huayi* relied on similar information in accepting Commerce's decision to use Mexico as the primary surrogate country.  *Heze Huayi Chemical*, 2018 WL 2328183, at [*4]; Def. Br. at 14-15.  There, the court addressed Commerce's finding in an administrative review of a similar record that Mexico was a significant producer of chlorinated isos.[6]  *Heze Huayi Chemical*, 2018 WL

---

[6] Specifically, the court in *Heze Huayi* upheld Commerce's finding that there was significant production of chlorinated isos in Mexico by Aqua-Clor, based on "petitioners' submission of a certain affidavit and joint venture agreement."  The data there were also

2328183 at *5.  The court ultimately upheld Commerce's choice of Mexico based on a consideration of much of the same information as in this case.  *Id*.

Here, Commerce's selection of Mexico as the primary surrogate country was based on a reasonable interpretation of "comparable merchandise."  Despite record information showing *some level* of production of identical merchandise in Malaysia, Commerce found that the record did not support a finding of *significant* production of identical merchandise in Malaysia, IDM at 10-11[7], and, consequently, used "best available information" in its selection of Mexico.  Def. Br. at 19-24.  Commerce explained adequately its finding that the Malaysian data that plaintiffs argue are more probative were insufficient.  *Id*.  In doing so, Commerce met its obligation to evaluate and compare the reliability and completeness of the record data on potential primary surrogate countries as required by Policy Bulletin 04.1.

Moreover, plaintiffs' argument that Malaysia produced more *comparable* merchandise than did Mexico neither negates that finding nor addresses the issue of whether there is significant production of *identical* merchandise in Mexico.  As a result,

---

corroborated by "extensive PIERS cross-border trade data on shipments of subject merchandise on the record."  2018 WL 2328183 at *5 (citation omitted); *see also* Def. Br. at 19.

[7] See also IDM at 11: "Commerce continued to find that record evidence in this review shows that Mexico is the only surrogate country producing identical merchandise in significant quantities . . . .  In the case of Malaysia, we preliminary found only one Malaysian company, Setia Maju, to be a producer of identical merchandise; however, no Malaysian product information was provided by the respondents to corroborate whether this producer or Malaysia, in general, had significant production of identical merchandise during the POR."

Commerce was reasonable in finding that Mexico was the only country at the same

level of economic development that had production of chlorinated isos during the POR.

*See* IDM at 11 (the record shows that "Mexico is the only surrogate country producing

identical merchandise in significant quantities" and "no Malaysian production information

was provided . . . to corroborate . . . significant production [there]").

In sum, Commerce's determination that Mexico was a "significant producer[] of

comparable merchandise" was based on a permissible construction of those terms

within the meaning of section 1677b(c)(4).  Consequently, Commerce met its obligation

to use "best available information" when Commerce valued factors of production using

Mexico as a primary surrogate country.

## II.    Commerce's Selection of Information

### A.    Financial Statements

Plaintiffs argue that Commerce should have used Malaysian surrogate values

because Malaysian producers have superior financial statements that constitute the

best available information.  Pls. Br. at 12-18.  In response, the Government contends

that "the data contained in the financial statements of the Mexican company, CYDSA,

were the best available information on the record to value surrogate financial ratios" and

that the selection of CYDSA's statements to value surrogate financial ratios is in

accordance with law and supported by substantial evidence.[8]  Def. Br. at 20.  The court

---

[8] While the Government in its brief stated that CYDSA was "the only company with
significant production of identical merchandise," Def. Br. at 20, the Government
conceded during Oral Argument that CYDSA does not produce *identical* merchandise

holds that Commerce's determination that CYDSA's financial statements was the best

available information is supported by substantial evidence.

In non-market economy antidumping proceedings, Commerce "relies upon

financial statements from surrogate producers of 'identical or comparable merchandise'

to determine surrogate values for manufacturing overhead, general expenses, and profit

. . . ." *Globe Metallurgical Inc. v. United States*, 35 CIT 705, 720, 781 F. Supp. 2d 1340,

1354 (2011) (citing 19 C.F.R. § 351.408(c)(4)).  "The data on which Commerce relies to

value inputs must be the 'best available information,' but there is no requirement that

the data be perfect."  *Home Meridian Int'l Inc. v. United States*, 772 F.3d 1289, 1296

(Fed. Cir. 2014).  "Commerce's 'best available information' analysis is context and fact

dependent."  *Seah Steel Vina Corp. v. United States*, 950 F.3d 833, 842 (Fed. Cir.

2020) (citing *Dorbest Ltd.  v. United States*, 30 CIT 1671, 1675, 462 F. Supp. 2d 1262,

1268 (2006) (citation omitted)).[9]

Commerce's practice is to "generally select[], to the extent practicable, surrogate

values that are publicly available, are product-specific, reflect a broad market average,

and are contemporaneous with the period of review."  *Weishan Hongda Aquatic Food*

---

but, rather, CYDSA produces only *comparable* merchandise.  *See* Oral Argument Tr. at
72-73 (emphasis supplied).

[9] Commerce's Policy Bulletin dictates consideration of whether "crucial factor price data
. . . are inadequate or unavailable."  Policy Bulletin 04.1 at 4.  In general, however, "the
criteria outlined in the section of Policy Bulletin 04.1 captioned 'Data Considerations'
were developed to serve as a 'tie-breaker,' if necessary, in Commerce's identification of
a surrogate country."  *Jinan Yipin Corp., Ltd. v. United States*, 800 F. Supp. 2d 1226, n.
7 (2011).

*Co. v. United States*, 917 F.3d 1353, 1365 (Fed. Cir. 2019) (citing *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014)).  "[T]he court's role 'is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'"  *Dorbest*, 462 F. Supp. 2d at 1268 (citing *Goldlink Indus. Co., Ltd. v. United States*, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006)).

Commerce determined that reliance on CYDSA's financial statements to calculate financial ratios was appropriate.  IDM at 12.  Since there was information regarding "the production of identical merchandise in Mexico" and "selecting Mexican data did not lead to factor valuation difficulties," Commerce explained that "[Commerce was] not required to consider parties' arguments for comparable merchandise."  *Id.* at 11.  Commerce noted that "[Commerce] preliminarily found only one Malaysian company, Setia Maju, to be a producer of identical merchandise," but that "there is no evidence of what quantities . . . or when it may have produced subject merchandise." *Id*.  Additionally, in its Preliminary Determination, Commerce examined and dismissed, for the reasons stated, financial statements from four other Malaysian companies — Mey Chern, Whiting, Accot and CCM.  PDM at 7-8.  Finally, Commerce addressed plaintiffs' concerns on CYDSA's "level of integration and having its own energy division," explaining that "[o]ur finding in this review is consistent with past reviews" and noting that "the CIT has upheld our recent decision to use CYDSA's financial statements." IDM at 12 (citing *Heze Huayi Chemical Co., Ltd. and Juancheng Kangtai Chemical Co.,*

*Ltd. v. United States*, Slip Op. 18-57 (CIT 2018) at 20 (upholding the selection of CYDSA's financial statements)).

Plaintiffs argue that Commerce should have used Malaysian surrogate values because Malaysia has superior financial statements that constitute the best available information.  Pls. Br. at 12-18.  Plaintiffs explain: "Not only does Malaysia source multiple financial statement [*sic*] instead of one, but each of the companies is more comparable than the sole Mexican company, CYDSA."  *Id*. at 15.  Plaintiffs argue further that CYDSA, as a massive conglomerate, operates under "radically dissimilar" circumstances from the respondent company.  *Id*. at 16-17.  Plaintiffs conclude "that the Malaysian surrogate values are the best available information and, according to past Department practice to prefer the country with multiple financial statements, the Department should have relied on Malaysia."  *Id*. at 18.

The Government responds that "the data contained in the financial statements of the Mexican company, CYDSA, were the best available information on the record to value surrogate financial statements" and that "Commerce's selection of [CYDSA]'s financial statement to value surrogate financial ratios is in accordance with law and supported by substantial evidence."  Def. Br. at 20.  The Government relies on the fact that "Mexico is the only country with significant production of identical merchandise" and that "CYDSA provides a usable financial statement."  *Id*. at 22.  Further, the Government explains that plaintiffs' financial statement information regarding three of the Malaysian companies — Accot, May Chern and Whiting — was "completely unusable to value surrogate financial ratios" and that a fourth company — CCM — "did

not provide any corroborating information to support that CCM is a significant producer of comparable merchandise." *Id.* at 22.

For the following reasons, the court holds that Commerce's determination that CYDSA's financial statements were the best available information is supported by substantial evidence.

### 1.    Mexican Production of Identical and Comparable Merchandise

In its Preliminary Determination and Final Determination, Commerce found that the record indicated that there was Mexican production of identical merchandise by Aqua-Clor.  PDM at 12; IDM at 11.  However, here, the data used by Commerce in the calculation of surrogate financial ratios are from CYDSA, which produces comparable — not identical — merchandise.[10]  *See* IDM at 8; Def. Br. at 22; *see also* Oral Argument Tr. at 57.[11]  The Government argues that the fact that "Mexico is the only country with significant production of identical merchandise" supports that "CYDSA's financial statement is the best available information in this review for selecting surrogate financial ratios."  *Id*.  Plaintiffs counter that "the suggestion that financial ratios from a company that does not produce identical merchandise are somehow more comparable . . .

---

[10] *See* footnote [8], above.

[11] At Oral Argument, the Government provided several justifications for its use of CYDSA's financial statements.  First, the Government noted that Commerce "uses the import data into the country, not specifically [*sic*] to a particular producer."  Oral Argument Tr. at 56.  Second, the Government noted that Commerce prefers data from the primary surrogate country.  *Id.* at 57.  And third, "[Commerce] needs something that is publicly available and in English" and also takes into consideration the data quality from producers in Malaysia, "which are less reliable than that from Mexico."  *Id.* at 58.

because a company exists in the same country that produces identical merchandise is utterly illogical."  Pls. Reply Br. at 6.

The Court has previously found, in the context of Commerce's consideration of which financial statements qualify as best available information, "no support for any preference between identical versus comparable merchandise" and that "Commerce's regulation does not forbid treatment of identical and comparable merchandise as equivalent."  *Jiaxing Brother Fastener Co. v. United States*, 34 CIT 1455, 1462, 751 F. Supp. 2d 1345, 1353 (2010).

The Court of Appeals for the Federal Circuit ("Federal Circuit") has more recently noted Commerce's "practice . . . to 'use, whenever possible, the financial statement of a producer of identical merchandise.'"  *Seah Steel Vina Corp. v. United States*, 950 F.3d 833, 841 (Fed. Cir. 2020).  In *Seah Steel*, the Federal Circuit agreed with Commerce's determination that "while '[the company] Bhushan operates at a different level of integration than [SeAH],' 'Bhushan['s] financial statements are appropriate . . . because Bhushan produces identical merchandise.'"  *Id*. at 842.  Notably, *Seah Steel* referenced a preference for production of identical merchandise by the company in question — not by the country as a whole — to determine the appropriateness of financial statements. *See id.*

If CYDSA produced identical merchandise, the court would agree that this fact would be relevant to determining that CYDSA's financial statements were the best available information.  In this instance, however, the court agrees with plaintiffs that the Government's reliance on the fact that a *different* company in Mexico produces identical

merchandise is not compelling here, and, therefore, would not of itself constitute a factor

supporting Commerce's conclusion that CYDSA's financial statements were the best

available information.

The court, accordingly, considers whether Commerce demonstrated sufficiently

that CYDSA's financial statements are nonetheless the best available information.  For

the following reasons, the court agrees that Commerce's decision was reasonable.

### 2.    CYDSA's Financial Statements

Plaintiffs argue that, based on the methodology that Commerce used to analyze

the Malaysian companies' financial statements, Commerce should have found that

CYDSA does not in fact produce a significant quantity of comparable merchandise.  Pls.

Br. at 15.  Plaintiffs note that CYDSA is a massive conglomerate, with its chemicals

division serving as only one of five such divisions, and that it operates under "radically

dissimilar" circumstances than the respondent companies (Heze Huayi and Kangtai).

*Id*. at 15-17.  Plaintiffs maintain, for example, that the corporate configuration of CYDSA

results in differences in marketing and branding expenses.  *See Shenzhen Xinboda*

*Indus. Co. v. United States,* 38 CIT __, __, 976 F. Supp. 2d 1333, 1383 (2014).

Plaintiffs note further that CYDSA differs in its level of integration, and "the fact that

CYDSA produces this energy and self-consumes" also makes it dissimilar.  *See* Oral

Argument Tr. at 68-69.  Additionally, "[CYDSA] has incurred high SG&A costs[12] due to

major expansions and investments."  Pls. Reply Br. at 7.

---

[12] SG&A costs represent selling, general and administrative expenses.

The Government explains that "Commerce's selection of [CYDSA], in spite of

those issues, is consistent with its selection in the last three reviews . . . . [I]n *Heze*

*Huayi*, the Court [*sic*] sustained that decision in the face of these very same arguments."

Oral Argument Tr. at 74 (italics supplied).  The Government correctly notes that the

court already addressed the internal energy generation issue in *Heze Huayi*.  *See id.*

(citing *Heze Huayi*, 2018 WL 2328183 at *6-8).  In *Heze Huayi*, the court upheld

Commerce's determination — that CYDSA's financial statements were suitable for

calculating financial ratios — as supported by substantial evidence and in accordance

with law, despite similar concerns raised on energy inputs.  *See Heze Huayi,* Slip Op.

18-57, 2018 WL 2328183, at *9 (CIT May 22, 2018).  The court also explained that

"CYDSA is a producer of comparable merchandise, not identical merchandise, but

Commerce 'has wide discretion in choosing among various surrogate sources.'"  *Id.*

(citing *FMC Corp. v. United States*, 27 CIT 240, 251 (2003)).

Moreover, the court in *Seah Steel* found that "where, as here, Commerce finds

that better information is not available . . . Commerce may use the financial statements

of 'companies with differing integration levels."  *Seah Steel*, 950 F.3d at 841 (citing

*Home Meridian*, 772 F.3d at 1296).  Since, as discussed below, Commerce found that

the Malaysian financial statements do not present a better alternative, the court agrees

that Commerce's selection of CYDSA's financial statement as the best available here

was reasonable.  "The data on which Commerce relies to value inputs must be the 'best

available information,' but there is no requirement that the data be perfect."  *Home*

*Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014).

### 3.      Malaysian Financial Statements

Plaintiffs argue that Commerce relied on only one financial statement from

CYDSA when "[Commerce] has a strong preference to use multiple financial

statements" to "reduce[] the potential for [cost] distortions in the comparable industry."

Pls. Br. at 17.  Plaintiffs contend that Commerce has "often made surrogate country

determinations based on the comparability and quantity of available financial

statements" and has indicated a "preference for using multiple financial statements." *Id*.

at 12-13 (citing *Certain Activated Carbon From the People's Republic of China*, 77 Fed.

Reg. 67,337 (Dep't Commerce Nov. 9, 2012) (final results ADD admin. review) and

accompanying Issues Decision Memorandum at Comment 1F; *Steel Wire Garment*

*Hangers from the People's Republic of China*, 78 Fed. Reg. 28,803 (Dep't Commerce

May 16, 2013) (final results)).  Here, plaintiffs argue that this practice weighs in favor of

finding that multiple  financial statements from multiple Malaysian companies were more

suitable than financial statements from a single Mexican company.  Pls. Br. at 17

Commerce considered and rejected reliance on the Malaysian statements,

explaining that — as noted above — three of the four Malaysian financial statements

were "unusable for various reasons."  PDM at 12-13; Def. Br. at 21.  As to the fourth

(CCM), Commerce determined that "CCM did not provide the best available information

on the record."  Def. Br. at 21.  Commerce found that CCM was a producer of

comparable merchandise, but no corroborating information was presented to show that

CCM was a *significant* producer of comparable merchandise.  IDM at 9.  Similarly,

Commerce noted that no financial information was provided for the fifth producer, Setia Maju.  PDM at 13.

The court agrees that Commerce typically "prefers to use multiple financial statements to normalize any potential distortions that may arise from using the statements of a single producer."  *NTSF Seafoods Joint Stock Co. v. United States*, Slip Op. 19-63, 2020 Ct. Intl. Trade LEXIS 189, at *15 (CIT Dec. 21, 2020).  However, Commerce prefers multiple financial statements only "as long as those financial statements 'are not distortive or otherwise unreliable.'"  *Dorbest*, 604 F.3d at 1374.   The court concludes, for the following reasons, that Commerce adequately explained why the preference for multiple financial statements was not dispositive here.

First, the record supports Commerce's conclusion that the financial statements of one of the Malaysian companies, Mey Chern, are not reliable.  IDM at 9.  PDM at 12. Its financial statements "are not contemporaneous with the POR" and it is not "a demonstrated producer of either identical or comparable merchandise."  IDM at 9. Plaintiffs maintain that Mey Chern is a manufacturer and trader of ten chlor-alkali chemicals, including sodium hypochlorite, and that Commerce has found sodium hypochlorite to be highly comparable to chlorinated isocyanurates.  Pls. Br. at 14. However, the Government correctly notes that "Mey Chern's financial statements did not identify the merchandise involved in its trading and/or manufacturing activities . . . and no record evidence corroborates the contention that Mey Chern produces sodium hypochlorite."  Def. Br. at 21-22 (citing PDM at 12).  Commerce noted in the PDM that

the "website information only identifies the company as a *trader* of sodium hypochlorite."
PDM at 12 (emphasis supplied).

Second, the financial statements from Mey Chern's holding company, Whiting,
suffer from similar flaws.  IDM at 9.  Whiting's statements also "are not
contemporaneous with the POR" and the company is not a demonstrated producer of
either identical or comparable merchandise.  *Id.*  Plaintiffs maintain that Commerce
could use Whiting's financial statements to capture "the financial ratios of the
manufacturing company and not merely the investment company."  Pls. Br. at 14.
However, it is not clear how this would solve the flaws in these data identified in the
Final Determination.  The Government points out that "no record evidence corroborates
the contention that Whiting is involved in 'trading and manufacturing' of chemicals such
as sodium hypochlorite."  Def. Br. at 21; *see also* PDM at 12.  This lack of corroborating
evidence weighs against plaintiffs' argument that the Malaysian financial statements
were more suitable.

Third, the financial statements of Accot are flawed as well.  According to those
statements, Accot's principal activity is dealing with industrial chemicals.  IDM at 9.
While Accot's website references the sale of a comparable product, "the website also
notes that it imports the bulk of its products."  *Id.*  A single product data sheet from
Accot was on the record, and it showed "that the comparable product, calcium
hypochlorite, originated from Japan."  *Id.*  According to plaintiffs, even if Accot sources
one of its chemicals from Japan, that sourcing practice does not prove that other
comparable products are sourced from Japan.  Pls. Br. at 14.  However, plaintiffs offer

no record evidence to support the argument that other comparable products produced
by Accot are sourced from another place of origin.

Finally, the record does not support that CCM was a significant producer of
comparable merchandise.  IDM at 9.  CCM is the only Malaysian company with
"sufficient information on the record showing it to be a producer of comparable
merchandise."  PDM at 13.  However, the data suffer from flaws.  First, no corroborating
information demonstrates that CCM is a "significant producer of comparable
merchandise."  *Id.*  Second, Malaysian HTS numbers are less precise than Mexican
HTS numbers.  Mexico has an eight-digit level HTS number applicable to the subject
merchandise, while the relevant Malaysian HTS number "does not separately break out
chlorinated isos within the basket of products" included in the classification.  *Id.*  At Oral
Argument, the Government further pointed out that CCM "had sales and marketing
subsidiaries, was involved in an energy systems joint venture" and that it "had several of
the same problems that are being alleged to exist with the CYDSA statement."  Oral
Argument Tr. at 76.  In light of the issues that were identified in the record, the court
does not find a basis to support plaintiffs' contention that CCM is "highly preferable" to
CYDSA.

In view of the foregoing, the court holds that Commerce sufficiently explained its
concerns with the four Malaysian financial statements on the record and Commerce's
reasoning that CYDSA's financial statement had the "highest quality [surrogate value]
data on the record."  PDM at 16.  While plaintiffs are correct in demonstrating that the
Mexican data were flawed in certain respects, the fact that "the data may be imperfect"

does not preclude Commerce's decision from being considered reasonable.  *See*

*Jiaxing Brother Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1301 (Fed. Cir.

2016).  The court finds here that, given these two choices, a "reasonable mind could

conclude that Commerce chose the best available information" in selecting the Mexican

data.  *See Dorbest*, 462 F. Supp. 2d at 1258.  Accordingly, the court holds that

Commerce's selection of the Mexican data is supported by substantial evidence and

otherwise in accordance with law.

> **B.      Commerce's Reliance on Global Trade Atlas (GTA) data**

Plaintiffs argue that Commerce's determination that GTA data are superior to

TDM data is arbitrary and capricious.  Pls. Br. at 21-29.  They argue that Commerce

must provide a more robust explanation for rejecting the TDM data here because of

Commerce's prior reliance on TDM data.  Pls. Reply Br. at 13.  The Government claims

that during the review, Commerce found plaintiffs' argument in support of its Malaysian

TDM data as moot and claims that Commerce's selection of Mexican GTA import data

is supported by substantial evidence.  Def. Br. at 22-24.  For the reasons discussed, the

court concludes that the issue of Commerce's database selection is moot — because

Commerce acted within its discretion to use Mexican GTA data based upon its selection

of Mexico as primary surrogate country.

Under Commerce's sequential analysis, Commerce first considers economic

comparability by compiling a list of potential surrogate countries that are at a

comparable level of economic development to the NME country, identifies producers of

comparable merchandise among the potential surrogates, then determines whether any

of the producers of comparable merchandise are "significant" producers of that

comparable merchandise.  *Id*. at 2-3.  It is only after that point — the fourth step in the

process — that Commerce weighs data considerations.  *Id*. at 3-4.  However, the Policy

Bulletin is not clear on the consideration of data when only a single country has survived

the selection process to this point, as it did in this instance.  *Id*.  The Policy Bulletin

instructs Commerce to consider whether crucial data from the selected surrogate

country are "inadequate or unavailable."  *Id*.

     As discussed above, Commerce's practice is to "generally select[], to the extent

practicable, surrogate values that are publicly available, are product-specific, reflect a

broad market average, and are contemporaneous with the period of review."  *Weishan

Hongda Aquatic,* 917 F.3d at 1365 (citing *Qingdao Sea*, 766 F.3d at 1386).  In

accordance with 19 C.F.R. § 351.408(c)(1), Commerce considers "publicly available

information to value factors [of production]" ("FOPs").  "The court will uphold

Commerce's surrogate value choices if the agency fairly considered record evidence

when choosing surrogates, so that a reasonable mind could accept Commerce's

findings."  *Blue Field (Sichuan) Food Indus. Co., Ltd. v. United States*, 37 CIT 1619,

1633, 949 F. Supp. 2d 1311, 1326 (2013) (citing *Consol. Edison Co. v. NLRB,* 305 U.S.

197, 217 (1938); *CITIC Trading Co. v. United States,* 27 CIT 356, 361 (2003)).

     The governing statute specifies that Commerce must use "best available

information" when valuing FOPs.  19 U.S.C. § 1677b(c)(1)(B).  The statute does not

define "best available information," so Commerce has "broad discretion" to decide which

record information meets this standard.  *Zhejiang,* 652 F.3d at 1341 (citations omitted).

The role of a reviewing court is "not to evaluate whether the information Commerce

used was the best available, but rather whether Commerce's choice of information is

reasonable." *Peer Bearing Co.-Changshan v. United States*, 27 CIT 1763, 1770, 298 F.

Supp. 2d 1328, 1336 (2003).

On October 3, 2018, Commerce invited the parties to comment on the selection

of surrogate countries and provide surrogate valuations of FOPs of chlorinated isos.

PDM at 2.  Plaintiffs submitted Malaysian import data from TDM and petitioners

submitted Mexican import data from GTA.  *Id.* at 7-8.  Commerce preliminarily found the

Malaysian surrogate values to be "unusable because they are sourced from TDM, a

subscription-based database.[13]"  PDM at 16.  In its Final Determination, Commerce

found "the issue of using TDM data as a source for Malaysian surrogate values to be

moot" because "the record information shows Mexico as the only significant producer of

identical merchandise and having usable surrogate value data for all FOPs."  IDM at 14.

Plaintiffs argue that Commerce's decision to use GTA data for Mexico over TDM

data for Malaysia is unreasonable because in taking that decision, Commerce favored

arbitrarily one dataset over another.  Pls. Br. at 21-29.  According to plaintiffs,

Commerce "acted arbitrarily not only in treating two data sources differently, when they

are the same in reliability and access, but also acted arbitrarily in discounted [sic] an

entire surrogate county [sic] for this issue in this review."  *Id.* at 21.  Further, plaintiffs

---

[13] At Oral Argument, plaintiff pointed out the problematic nature of Commerce's
reasoning in its preliminary determination.  As plaintiff explained, "Both GTA and TDM
are paid subscription sources that gather data from the same official government
source."  Oral Argument Tr. at 77.

argue that Commerce's statement that "TDM is unusable because it is subscription-based" is indicative of inconsistency in Commerce's reasoning since both TDM and GTA are subscription-based.  Pls. Reply Br. at 10.

Plaintiffs also argue that Commerce must provide a more robust explanation for rejecting TDM data in the present case because Commerce has relied on TDM data in previous cases.  Pls. Reply Br. at 13.  To support their argument, plaintiffs cite to previous Commerce decisions in which Commerce used Malaysian TDM import data. IDM at 14 (citing *Steel Propane Cylinders From the People's Republic of China*, 83 Fed. Reg. 54,086 (Dep't Commerce October 26, 2018) (preliminary countervailing duty determination) ("*Steel Propane Cylinders*") and *Fresh Garlic From the People's Republic of China*, 84 Fed. Reg. 27,585 (Dep't Commerce June 13, 2019) (preliminary antidumping determination) ("*Fresh Garlic*")).  Plaintiffs state that Commerce's rejection of TDM data in the present case based on TDM's purported unreliability is arbitrary and capricious because Commerce relied on TDM data in those prior decisions.  Pls. Br. at 23.

The Government argues that Commerce's selection of Mexican GTA import data is supported by substantial evidence.  Def. Br. at 22-24.  In its Final Determination, Commerce found that the issue of using TDM data as a source for Malaysian surrogate values was moot because "the record information shows Mexico as the only significant producer of identical merchandise and having usable surrogate value data for all FOPs." IDM at 14.  The Government points out that "no other country on the surrogate country list produced identical merchandise."  Def. Br. at 23.  Because of Mexico's status as the

sole producer of identical merchandise out of the countries on the surrogate country list,

it is the Government's position that Commerce reasonably determined that the GTA

data from Mexico were "superior" to the Malaysian TDM data because Malaysia is "a

producer of comparable merchandise that Commerce did not select as the primary

surrogate country."  *Id.*  Because Mexico is the sole producer of identical merchandise,

the Government maintains that Mexico "provides the best available information on the

record to value all FOPs consistent with Commerce's longstanding preference to value

FOPs when possible from a single surrogate country."  Def. Br. at 24.

The Government also claims that Commerce "routinely relies" on GTA as a

source of surrogate values and "declined to use TDM data as an uncorroborated,

private, subscription-based database."  Def. Br. at 23 (citing *Steel Propane Cylinders*

from the People's Republic of China, 83 Fed. Reg. 66,675 (Dep't of Commerce Dec. 27,

2018) and accompanying Prelim. Decision Memo at 11 (Unchanged in Final); *Certain*

*Activated Carbon from the People's Republic of China*, 84 Fed. Reg. 27,758 (Dep't of

Commerce June 14, 2019) (prelim. admin. review) and accompanying Prelim. Decision

Memo at 15 (Unchanged in Final)).  The Government states that plaintiffs fail to

acknowledge the TDM data on the record "are not the best available information to

value surrogate country data."  Def. Br. at 22.

The Government is correct in contending that the issue of Commerce's database

selection is moot because plaintiffs seek improperly to fuse the issue of Commerce's

selection of a surrogate country with Commerce's selection of a database, which is a

data consideration.  Policy Bulletin 04.1 does not support plaintiff's claim that

Commerce erred in "treating two data sources differently."  Pls. Br. at 21.  When

Commerce has narrowed the selection process to a single country, the Policy Bulletin

instructs Commerce to weigh if crucial factor price data from that country are

"inadequate or unavailable."  Policy Bulletin 04.1 at 4.  The Policy Bulletin does not

instruct Commerce to select the country with the "best factors data" as the primary

surrogate country, because that direction applies specifically to situations when "more

than one country has survived the selection process."  *Id.*

　　　Commerce's use of GTA data rather than TDM data accords with its Policy

Bulletin.  The Policy Bulletin explicitly states that Commerce data considerations are to

be weighed in a "sequential" manner, following three other steps in the surrogate

country selection process.  Policy Bulletin 04-1 at 2.  The Government explains that it

used GTA data from Mexico because GTA data were the only available data on the

record from the primary surrogate country that Commerce selected — Mexico.  IDM at

14.  Def. Br. at 23.  As discussed above, Commerce's decision to select Mexico as

primary surrogate country was supported by substantial evidence and in accordance

with law.  *See supra* Section I.  Since Commerce selected Mexico as the primary

surrogate country, a determination of which database was "best" was unnecessary.

Accordingly, Commerce's use of GTA data was supported by substantial evidence.

　　　The record shows that Commerce exercised properly its broad discretion in

selecting the best available information for the record from a reliable database.  *See,*

*e.g., Timken Co. v. United States*, 16 CIT 142, 147, 788 F. Supp. 1216, 1220 (1992)

(clarifying that "[w]hen Commerce is faced with the decision to choose between two

alternatives and one alternative is favored over the other in their eyes, then they have

the discretion to choose accordingly if their selection is reasonable." (citations omitted)).

Here, there is no indication that Commerce abused its discretion because Commerce

had reasonably selected Mexico as the primary surrogate country and the surrogate

values from Mexico are in the form of GTA data.

Moreover, while Commerce used TDM data in past cases, it has also previously

explained its preference for the GTA database as a source of reliable data.  *See, e.g.,*

*Decision Memorandum for the Preliminary Results of Antidumping Duty Administrative*

*Review: Certain Activated Carbon from the People's Republic of China,* 84 Fed. Reg.

27,758 (Dep't Commerce June 14, 2019) and accompanying PDM at 15 (stating, "[GTA]

is a source that is regularly used by Commerce because the data therein meet

Commerce's SV criteria."); *see also, Steel Propane Cylinders from the People's*

*Republic of China*, 83 Fed. Reg. 66,675 (Dep't Commerce Dec. 27, 2018) and

accompanying PDM at 10 (stating, "...because TDM is a private, subscription-based,

database, we are unable to corroborate the data submitted and preliminarily decline to

use the TDM data as the source of SVs for the purposes of this investigation.").

Plaintiffs argue that because Commerce used TDM data in the past, Commerce

must provide an explanation here for rejecting the TDM data in the present case.  Pls.

Reply Br. at 11 (citing *SKF USA Inc. v. United States,* 263 F.3d 1369, 1382 (Fed. Cir.

2001)).  However, no authority mandates that Commerce provide an explanation for the

rejection of TDM data in the instant case.  In *SKF USA Inc. v. United States*, Commerce

defined inconsistently a statutory term ("foreign like product") within a single proceeding.

263 F.3d at 1382.  The court held that Commerce is required to provide an explanation

for defining the same phrase in two different ways in the course of the same

proceeding.  *Id.*  The court finds such a comparison inapposite to the use of different

data in a different proceeding, which is at issue in this case.

        In addition, the Government is correct to note that Commerce has a

"longstanding preference" to value FOPs from a single surrogate country when possible.

Def. Br. at 24.  "Except for labor, as provided in paragraph (d)(3) of this section, the

Secretary normally will value all factors in a single surrogate country."  19 C.F.R

§351.408(c)(2).  *See also Clearon Corp. v. U.S.,* 37 C.I.T. 220, 228, 2013 WL 646390,

at *6 (CIT, 2013) (stating, ". . . the court must treat seriously the Department's

preference for the use of a single surrogate country.").

        Moreover, in response to plaintiffs' reference to Commerce's prior use of TDM

data in *Fresh Garlic* and *Steel Propane Cylinders*, the Government notes that the

circumstances of those two cases differ from the present one.  Def. Br. at 23-24.  The

Government is correct to distinguish both cases from the instant case.

        In *Fresh Garlic*, Commerce relied upon TDM data because "there [were] no

usable alternative import statistics on the record, because those provided by

[petitioners] were not translated."  Fresh Garlic IDM at 15.  In that case, Commerce had

determined that Romania and Mexico were significant producers of identical

merchandise.  Fresh Garlic PDM at 11.  Commerce noted that "if more than one country

meets the economic comparability and significant producer of comparable merchandise

criteria, 'then the country with the best factors data is selected as the primary surrogate

country.'"  *Id*. at 12 (citing Policy Bulletin 04.1).  Because the submitted Mexican import

statistics were not translated, Commerce found that Mexico could not be selected as the

primary surrogate country and, instead, relied on TDM data from Romania.  *Id. a*t 12-14.

Reliance on *Fresh Garlic* does not aid plaintiffs' argument here because, in that case,

*both* Romania and Mexico were found to be significant producers of identical

merchandise.  *Id.* at 11.  In the present case, Commerce determined that Mexico is the

only significant producer of identical merchandise.  IDM at 14.

Plaintiffs' argument relating the instant case to *Steel Propane Cylinders* — to

demonstrate that Commerce previously relied on TDM data — is also misplaced.  In

*Steel Propane Cylinders*, Commerce used TDM data, averaged with export prices

submitted by respondents, to develop benchmark data that themselves are averaged.

*Steel Propane Cylinders* PDM at 15.  Establishing a weighted average benchmark in a

countervailing duty investigation is inapposite to selecting a surrogate country for FOPs

in an antidumping investigation.  *See Canadian Solar International Limited v. United*

*States*, 378 F. Supp. 3d 1292 (finding Commerce's reliance on negligible import

quantities without addressing the impact this negligible volume has on reliability of the

benchmark unreasonable).

The court recalls that Commerce "has wide discretion in choosing among various

surrogate sources."  *FMC Corp. v. United States*, 27 CIT 240, 251 (2003), *aff'd*, 87 Fed.

Appx. 753 (Fed. Cir. 2004).  The court recognizes that "Commerce retains discretion

over its preferred data, and on the record here, the court cannot intrude upon

Commerce's informed determination on this issue*."  Clearon Corp. v. United States*, Slip

Op. 16-110, 2016 Ct. Int'l Trade LEXIS 110, at *35 (CIT Nov. 23, 2016).  Commerce

exercised reasonably this discretion in selecting GTA data that plaintiffs concede were

valid.[14]  Commerce's decision to select GTA data for Mexico and Commerce's

explanation thereof are supported by substantial evidence and are in accordance with

law.

## II.    CIF Adjustment

Plaintiffs argue that Commerce's CIF adjustment to Mexico's FOB value was not

supported by substantial evidence.  Pls. Br. at 29-31.  Plaintiffs argue that Commerce's

adjustment included values that were unreasonably inflated and do not reflect in two

respects commercial reality.  *Id.*  First, plaintiffs argue that Commerce derived

information regarding marine insurance prices from unreasonable sources.  *Id*. at 30.

Plaintiffs point in particular to Commerce's use of marine insurance price data from

2010, seven years prior to the POR.  *Id.*  Additionally, the price relied upon involved the

shipment of general merchandise to and from the United States and was not specific to

marine insurance costs from Mexico to the United States or other economically

comparable countries.  *Id.*  Second, plaintiffs argue that Commerce's adjustment

unreasonably added long-distance freight costs.  *Id.*  Plaintiffs argue that the freight

costs of shipping inorganic chemicals from Shanghai to Long Beach or Houston, which

Commerce relied upon, are based on "long [*sic*] expensive routes that are not specific

---

[14] Plaintiffs implicitly concede this validity by asserting: "The Department acted arbitrarily
. . . in treating two data sources differently, when they are the same in reliability and
access. . . ." Pls. Br. at 21.

or comparable to the costs that a Mexican chlor [*sic*] isos producer would incur." *Id*.

Instead, plaintiffs argue, "the vast majority of the imports are across a nearby land

border." *Id.*

  The Government argues that its adjustment of FOB values to a CIF basis

adhered to its past practice.  Def. Br. at 25 (citing *Hydrofluorocarbon Blends from the*

*People's Republic of China*, 84 Fed. Reg. 17,380 (Dep't Commerce Apr. 25, 2019) (final

determination)).  The Government states that "limiting the surrogate country selection

process to countries that reported import data on a CIF basis may limit unreasonably

the potential pool of possible surrogate countries." *Id.*  Additionally, the Government

argues that plaintiffs fail to show for two primary reasons that Commerce's CIF

adjustment is not supported by substantial evidence.

  First, the Government argues that plaintiffs "did not provide any alternative data

for use in adjusting the FOPs to a CIF basis during review," including regarding Mexican

import data and freight costs.  *Id.* at 25-26.  Second, the Government argues that

plaintiffs failed to explain the reason that the adjustment disqualified Mexico as the

preferred surrogate country given Commerce's stated "policy consideration of not

limiting the potential pool of possible surrogate countries." *Id.*  According to Commerce,

limiting the surrogate country selection process to only those countries that report

import data on a CIF basis may "unreasonably limit" the potential pool of countries. *Id.*

(citing Certain Quartz Surface Products From the People's Republic of China, 84 Fed.

Reg. 23,767 (Dep't of Commerce May 23, 2019) (final LTFV investing.), and

accompanying IDM at cmt. 8).

The record demonstrates that Commerce's use of Mexican data and adjustment of those data to a CIF basis were reasonable.  Commerce explained that its process reflected two purposes: (1) adherence to existing policy outlined in its Policy Bulletin and (2) enabling selection of primary surrogate countries from a broader pool. Additionally, plaintiffs failed to provide information demonstrating that Commerce failed to rely on "best available information" here.  19 U.S.C. § 1677b(c).

### A.    Commerce's Use and Adjustment of FOB Data

In the instant case, Commerce provided three rationales for its decision, each of which independently provides a sufficient basis for its decision to use FOB data and adjust it to a CIF basis.  "Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court."  *NMB Sing. Ltd v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009).

First, as discussed above, Commerce reasonably selected Mexico as the primary surrogate country, and the Mexican import statistics are reported on a FOB basis. Therefore, Commerce reasonably relied on the data that were available as a result of its selection of Mexico as the primary surrogate country.

Second, Commerce adhered to an existing stated practice.  "[W]hen the import statistics of the surrogate country do not include [CIF] costs, [Commerce] has added surrogate values for international freight and foreign brokerage and handling charges to the calculation of normal value."  *Jiangsu Zhongji Lamination Materials Co., (HK) v. United States*, 43 CIT __, __, 396 F. Supp. 3d 1334, FN 2 (2019) (quoting Policy

Bulletin 10.2: Inclusion of International Freight Costs When Import Prices Constitute

Normal Value (Nov. 1, 2010) (available at: https://enforcement.trade.gov/policy/PB-

10.2.pdf)).  Plaintiffs argue that Commerce should not have adjusted the data to

approximate CIF values, but Commerce's Policy Bulletin anticipates explicitly that

Commerce may perform these types of adjustments.  *See* Policy Bulletin 10.2 (stating

that "in situations where the surrogate country import statistics do not include

international freight costs, the Department will add international freight and foreign

brokerage and handling charges to the import value.").

As defendant-intervenors argue in their brief, "Commerce reasonably treated the

adjustment from FOB to CIF basis as a secondary adjustment *after* it applied the

analysis set forth in Policy Bulletin 04.1."  Def.-Intervenors' Br. at 17 (emphasis in

original).  Moreover, in prior investigations and reviews, Commerce has adjusted

Mexican FOB values, demonstrating further that its methodology here represented an

adherence to past practice.  Def. Br. at 25.  *See Hydrofluorocarbon Blends from the*

*People's Republic of China*, 84 Fed. Reg. 17,380 (Dep't of Commerce April 25, 2019)

(final admin. review) and accompanying Issues and Decision Memo at 13 (Commerce

adjusted Mexican FOB values to account for movement expenses by adding an amount

for international freight and marine insurance.).

Third, Commerce's practice aligned with its stated goal "of not limiting the

potential pool of possible surrogate countries."  Def. Br. at 26.  Commerce's ability to

make adjustments allows it to use data from countries that report on an FOB basis as

well as on a CIF basis, thereby enabling Commerce to consider a broader range of

possible surrogate countries.

### B. Whether Plaintiffs Demonstrated that Commerce's CIF Adjustment Likely Distorted Surrogate Values

In examining Commerce's use and adjustment of these data, the court must

determine whether it is reasonable to conclude that Commerce's treatment of the data

aligned with the statute's directive to choose the "best available information."  19 U.S.C.

§ 1677b(c).  *See Goldlink Indus. Co. v. United States,* 30 CIT 616, 619, 431 F. Supp. 2d

1323, 1327 (2006) (stating "[t]he Court's role . . . is not to evaluate whether the

information Commerce used was the best available, but rather whether a reasonable

mind could conclude that Commerce chose the best available information.").

*Jiangsu* instructs that distortion occurs when a CIF value lacks a specific

connection to the FOB value.  In *Jiangsu*, the company used for CIF additions provided

data from two South African ports.  *Jiangsu Zhongji Lamination Materials Co., (HK)* at

1352.  Despite the small sample size — which plaintiff argued was distortive — the

court held that those "ports were of specific relevance to South African import data" (the

two ports selected for the CIF adjustment were in South Africa, which was the surrogate

country).  *Id.*  That specific connection contributed to the court's finding that distortion

had not occurred. *Id.*

Here, plaintiffs have not demonstrated that it would be unreasonable to

conclude that Commerce chose the best available information by using and adjusting

FOB data.  To demonstrate that Commerce's reliance on information in the record was

unreasonable, plaintiffs must show that Commerce's CIF adjustment is likely to distort

surrogate values.  *Jiangsu Zhongji Lamination Materials Co., (HK) v. United States*, 43

CIT __, __,  396 F. Supp. 3d 1334, 1353 (2019) (holding that Commerce's adjustment of

surrogate data from FOB values to CIF values was not distortive because the surrogate

to adjust from FOB to CIF came from ports with "specific relevance to South African

import data [surrogate country]").[15]  Plaintiffs argue that the addition of marine insurance

and international freight costs distorted the surrogate values here.  Pls. Br. at 29-30.

However, plaintiffs fail to show that such distortion occurred.

      Plaintiffs claim that the added shipping costs unreasonably doubled their margins

and are contrary to commercial reality, thereby distorting the surrogate values.  Pls. Br.

at 29.  However, plaintiffs have provided no evidence to support their assertion that "no

reasonable commercial producer would pay as much or more for the transportation of a

raw material than for the raw material itself."  *Id.*

      Plaintiffs argue that the marine insurance price data that Commerce used in its

adjustment are deficient for two reasons: (1) the prices are from 2010; and, (2) the

prices are specific neither to Mexico nor to other economically comparable countries.

Pls. Br. at 18-19.  However, plaintiffs do not provide any information demonstrating that

the price data are inaccurate such that they result in distorted CIF values.  *See Jiangsu*

*Zhongji Lamination Materials Co., (HK)* at 1352 (finding reasonable Commerce's

selection of FOB data even where the FOB data was not contemporaneous with the

---

[15] *Jiangsu* emphasizes further that the "need for the adjustment [of FOB data] should . .
. not weigh against the selection of [FOB data]."  *Jiangsu Zhongji Lamination Materials
Co., (HK) v. United States*, 43 CIT __, __, 396 F. Supp. 3d 1334, 1353 (2019).

period of investigation).  Commerce drew these data from petitioners' initial surrogate value submission.  IDM at 17.  Plaintiffs neither objected to the marine insurance price data when they were initially used, nor did plaintiffs provide any alternative data when they were provided the opportunity to do so.  *Id.*

Plaintiffs similarly fail to support their assertion that the international freight costs that Commerce used in its adjustment led to distorted values.  Plaintiffs claim that Commerce's decision to add international freight costs was unreasonable in two respects.  Plaintiffs claim that Commerce should not have added ocean freight costs because most shipping from Mexico to the United States occurs by truck.  Pls. Br. at 30. In making this argument, plaintiffs misstate the purpose of Commerce's adjustment, which is to determine the plaintiffs' production costs through use of data from a surrogate country.  *See* IDM at 17 ("Under NME methodology, Commerce is tasked with determining what the respondents' cost of producing subject merchandise would be if the NME country operated under market principles.  To do this, Commerce determines a market-economy value for each input used to produce that merchandise, and then it computes the cost of transporting that input to the factory in the NME country.").  The "need for [] adjustment" is part of this process.  *Jiangsu Zhongji Lamination Materials Co., (HK) v. United States*, 396 F. Supp. at 1353 (2019).

The Mexican import values used in this calculation do not include ocean freight costs, so Commerce factored in freight costs of shipping inorganic chemicals from Shanghai to Long Beach and Shanghai to Houston to reflect plaintiffs' costs more accurately.  *See Jiangsu Zhongji Lamination Materials Co.*,  43 CIT __, __, 396 F.

Supp. 3d at 1352.  ("The cost of international freight is included in the factors of

production for which Commerce must obtain surrogate values.").

　　　　In summary, Commerce both used and adjusted reasonably FOB data.

Commerce provided a legitimate reason for using FOB data and adjusting the data from

FOB to CIF basis.  The agency's decision-making process is "reasonably discernible" to

the Court, *NMB Sing. Ltd*, 557 F.3d at 1319, and plaintiffs have neither contested its

accuracy nor demonstrated that Commerce's data distorted surrogate values, such that

their use is unreasonable.

## CONCLUSION

　　　　It is not clear whether the swimming pool at the home of Benjamin Braddock's

parents contained chlorinated isocyanurates.  What is clear is that the swimming pool

featured prominently in the movie about Ben, his parents, their neighbor, Mrs.

Robinson, and her daughter, Elaine.[16]  In two of the pool scenes in *The Graduate*, the

virtuosity of director Mike Nichols (who won an Academy Award for the film) and his

hand-picked cinematographer Robert Surtees (winner of three prior Academy Awards,

including for *Ben-Hur*, and nominated an additional thirteen times, including for *The*

*Graduate*) is apparent.  In both, the directorial and camera work alone carries the story

line, not just punctuating the action and Buck Henry's phenomenal dialogue but earning

equal rights in telling the story and its themes of generational disconnect and divide.

---

[16] THE GRADUATE (Mike Nichols/Lawrence Turman Productions 1967).

In the first scene, Ben's parents have invited what appear to be family friends for Ben's twenty-first birthday.  Only one of the attendees is dressed to be poolside, the rest (including young children) look as though they are on the way to a cotillion.  Ben's father, with a booming, irritating voice, repeatedly asks Ben to come out of a poolside changing room and trots back and forth inanely between the hidden Ben, whom we can hear but not yet see, and the Braddocks' guests.  Ben keeps asking to speak to his father, clearly not wanting to come out for the dog and pony show his father has arranged.  His father repeatedly ignores Ben's requests to speak with him.

"You're disappointing them, Ben, you're disappointing them."

"Dad, can you listen?"

Mr. Braddock trots back to his guests, announcing Ben's imminent appearance: "he is going to give us . . . ."

Finally, Braddock Senior trots back yet again and pushes open the door open to reveal Ben, attired in a deep sea diving suit complete with giant flippers, helmet and rod. Nichols and Surtees position the camera at the doorway.  The camera, stationary, films Ben approaching ever closer, inane noise of the grownups and guests growing louder until, when Ben reaches the camera, it moves *inside* his helmet and we *see* what Ben sees — inanely gesticulating people, waving and smiling and clapping — and we *hear* what Ben hears — only the sound of his breathing, drawing in from the oxygen tank, and exhaling.  (Likely the most memorable inhaling-exhaling movie sequence until the appearance, six years later, of Darth Vader.)  As Ben approaches three descending stair steps, the camera tracks his head and we see just the steps and his giant flippers

descending the stairs, then resumes his march toward the pool.  He remains — together
with us, the audience — enveloped in the sound of his own breathing.

The two perspectives of the camera and audio have become the two
perspectives of the scene.  When the camera is pointed from the outside toward Ben,
we see and hear the clamorous perspective of his father and the other grown-ups
gesticulating in ridiculous ways and contributing inane comments about Ben in the
diving suit.  When the camera is inside the helmet, we see and, most importantly, hear
Ben's perspective: the sound of his breathing.  It is an updated version of the grown-ups
in the Peanuts cartoons — offering only "unintelligible warble," rendered musically with
the sounds "mwa-mwa-mwa-mwa."[17]  The scene ends when Ben walks down the steps
into the pool and floats to the bottom at the deep end, propping himself against the wall
so as not to bob to the surface, enveloped in silence, detached, completely, from the
inanity above.

The second scene opens with the camera faced up, directly into the sun, Ben's
father's face silhouetted as a dark shape with barely discernible features.

Mr. Braddock, irritated, shrill voice: "Ben, what are you doing?"

"Well," Ben starts, "I would say that I'm just drifting.   Here in the pool."

"Why?"  Irritation rising.  Camera pivots to Ben, seen completely clearly, except
for his eyes, hidden behind sunglasses, glaring sun reflecting off them.

---

[17] Jake Rossen, *The Reason Adults Are Never Visible in Charles Shulz's Peanuts
Comic Strips*, MENTAL FLOSS (Aug. 28, 2019),
https://www.mentalfloss.com/article/598218/peanuts-comic-strip-no-adults.

"Well, it's very comfortable just to drift here."

Camera back into the sun, Mr. Braddock silhouetted: "Have you thought about graduate school?"

"No."

"Would you mind telling me, then, what those four years of college were for? What was the point of all that hard work?"

Camera back to Ben, still in clear view: "You got me."

* * *

In conclusion, Commerce's determination is supported by substantial evidence and is otherwise in accordance with law.  Therefore, the court sustains Commerce's Final Determination.  Judgment will enter accordingly.

/s/      Timothy M. Reif
Timothy M. Reif, Judge

Dated:   August 5, 2021
         New York, New York